**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

GREE, INC.,

               *Plaintiff*,

      v.

SUPERCELL OY,

           *Defendant*.

Case No. 2:19-cv-00070-JRG-RSP
Case No. 2:19-cv-00172-JRG-RSP

## CLAIM CONSTRUCTION MEMORANDUM OPINION AND ORDER

This Order addresses the claim-construction disputes presented by the parties in Case No. 2:19-cv-00070-JRG-RSP (the "'070 Case") and Case No. 2:19-cv-00172-JRG-RSP (the "'172 Case"). Before the Court is the opening claim construction briefs of GREE, Inc. ("Plaintiff") ('070 Case Dkt. No. 115 and '172 Case Dkt. No. 71, both filed on Feb. 25, 2020),[1] the responses of Supercell Oy ("Defendant") ('070 Case Dkt. No. 126 and '172 Case Dkt. No. 79, both filed under seal on Mar. 10, 2020), and Plaintiff's replies ('070 Case Dkt. No. 130 and '172 Case Dkt. No. 82, both filed on Mar. 17, 2020). The Court held a hearing on the issues of claim construction and claim definiteness on April 14, 2020. Having considered the arguments and evidence presented by the parties at the hearing and in their briefing, the Court issues this Order.

---

[1] Citations to the parties' filings are to the filing's number in the docket (Dkt. No.) and pin cites are to the page numbers assigned through ECF.

**Table of Contents**

I.     **BACKGROUND** ................................................................................... **4**

    A.    The '137 and '481 Patents ............................................................ 4

    B.    The '873 and '302 Patents ............................................................ 5

    C.    The '655 Patent ............................................................................ 6

II.    **LEGAL PRINCIPLES** ....................................................................... **7**

    A.    Claim Construction ..................................................................... 7

    B.    Departing from the Ordinary Meaning of a Claim Term ..................... 10

    C.    Definiteness Under 35 U.S.C. § 112, ¶ 2 (pre-AIA) / § 112(b) (AIA) ................. 11

III.    **AGREED CONSTRUCTIONS** ......................................................... **12**

IV.    **CONSTRUCTION OF DISPUTED TERMS** .................................. **12**

    A.    Case No. 2:19-cv-070 ................................................................. 12

          A-1.    "player character" ............................................................ 12

          A-2.    "game content" ................................................................. 15

          A-3.    The Selection of Game Content Terms ............................ 17

          A-4.    The "Point" and "Parameter Value" Terms ..................... 20

          A-5.    "when a sum of the points …" ......................................... 23

          A-6.    "at appropriate timing" ................................................... 25

          A-7.    "in a state being identical to or different from the state of being displayed in the first field" ............................... 28

          A-8.    "possessed objects" ........................................................ 30

          A-9.    "request for transfer" ..................................................... 33

          A-10.   "in response to the request for transfer" ......................... 35

          A-11.   "second object" ............................................................... 36

          A-12.   "transfer information" .................................................... 40

          A-13.   "grant the second object …," "granting, by the server, the second object …," and "granting the second object …" ................ 42

          A-14.   "notifying the device of the second user that the first object is transferred, or that the second object is granted" ..................... 46

          A-15.   "shooting effective range" ............................................... 47

          A-16.   "touch operation" ........................................................... 49

          A-17.   The Display-a-Frame Terms ........................................... 53

          A-18.   "identify a second touch operation at the touch panel as an instruction for an attack when the first frame is displayed" ................ 57

    B.    Case No. 2:19-cv-172 ................................................................. 59

          B-1.    "shooting effective range" ............................................... 59

B-2.  "first touch operation" and "second touch operation" .............................. 60

B-3.  The Display-a-Frame Terms ..................................................................... 62

B-4.  "identify a second touch operation at the touch panel as an instruction for an attack when the frame is displayed" and "second touch operation in the frame" ................................. 64

B-5.  "first frame" ............................................................................................... 65

B-6.  "a slide operation" ..................................................................................... 68

V.   **CONCLUSION** .............................................................................................. **70**

## I.      BACKGROUND

In the two cases addressed in this Order, Plaintiff alleges infringement of five U.S. Patents. In the '070 Case, Plaintiff asserts four U.S. Patents: No. 9,604,137 (the "'137 Patent"), No. 9,774,655 (the "'655 Patent"), No. 9,795,873 (the "'873 Patent"), and No. 9,956,481 (the "'481 Patent"). In the '172 Case, Plaintiff asserts U.S. Patent No. 10,286,302 (the "'302 Patent"). The '137, '655, '873, '481, and '302 Patents are collectively referred to herein as the "Asserted Patents."

### A.  The '137 and '481 Patents

The '137 Patent and '481 Patent are related through a priority claim. The '481 Patent purports to be a continuation of the application that issued as the '137 Patent. They each list an earliest priority claim to a foreign application filed on March 4, 2013.

The abstract of the '137 Patent provides:

> A server provides a game that improves the interest in and taste of a battle event and increases the interest in and real enjoyment of the entire game. The server includes an information storage device that stores information related to the game, and a controller that accesses the information, performs various computations, and displays game images on a terminal device. In a battle event of this game, multiple character cards are aligned and displayed in a first field, and a player selects therefrom a character card to be used for a battle with an enemy character. The first field is replenished with another character card alternative to the selected character card as needed so that the player can further select an additional character card therefrom.

The abstract of the '481 Patent provides:

> A recording medium and server provide a game that improves the interest in and taste of a battle event and increases the interest in and real enjoyment of the entire game. The recording medium provides a game including a predetermined battle event comprising at least one battle. In a battle event of this game, game contents are displayed in a first field, and a player selects therefrom a game content to be used for a battle with an enemy character. The first field is replenished with another game content alternative to the selected game content as needed so that the player can further select an additional game content therefrom.

Claim 1 of the '137 Patent, an exemplary server claim, recites as follows, with disputed claim language emphasized:

**1**. A server connected to a terminal device operated by a player through a communication line to provide a game including a predetermined battle event comprising at least one battle, comprising:

an information storage device that stores information related to the game; and

a controller that accesses the information, performs computation on the game, and displays images of the game on the terminal device, wherein

the information storage device holds, as part of the information related to the game, plural kinds of *player characters* and at least one kind of enemy character associated with the predetermined battle event, information on a **game content** corresponding to each of the player characters, a *point* set for each of the player characters and/or each of the game contents, and information on *an upper limit of a point set for the battle or the predetermined battle event*,

the controller displays a plurality of the game contents in a first field on the terminal device so that the player can select at least one desired game content from the plurality of the game contents to attack the enemy character in the predetermined battle event, and

the controller permits the player to select the game contents *when a sum of the points of the player characters and/or the game content selected by the player is less than or equal to the upper limit of the point*, and

the controller sequentially subtracts the point of the selected game content from the upper limit of the point, and adds a predetermined amount to the upper limit of the point *at appropriate timing* or restores the upper limit of the point.

## B.  The '873 and '302 Patents

The '873 Patent and '302 Patent are related through a priority claim. The '302 Patent purports to be a continuation of the application that issued as the '873 Patent. They each list an earliest priority claim to a foreign application filed on February 26, 2013.

The abstracts of the '873 and '302 Patents are identical and provide:

> According to one embodiment, a shooting game control method, which is executed by a computer incorporated in a device including a display and a touch panel, includes accepting a touch operation on the touch panel; displaying a first frame indicative of a shooting effective range on the display in accordance with a position of the touch operation; accepting an instruction for an attack on an attack target in a state in which the first frame is displayed; determining whether the attack target in a game image displayed on the display is within the first frame or not, at a time point when the instruction for the attack has been accepted; and con- trolling the attack on the attack target in the game image in accordance with a result of the determining.

Claim 1 of the '873 Patent, an exemplary computer-readable medium claim, recites as follows, with disputed claim language emphasized:

> 1. A non-transitory computer-readable medium including computer-program instructions, which when executed by an electronic device including a display configured to display a game image and a touch panel provided integral with the display, cause the electronic device to:
> identify a first ***touch operation*** on the touch panel;
> ***cause the display to display a first frame indicative of a <u>shooting effective range</u> in accordance with a position of the first touch operation***;
> ***identify a second <u>touch operation</u> at the touch panel as an instruction for an attack when the first frame is displayed***; and
> control to attack in accordance with a display position of the first frame when the instruction for the attack is identified.

## C.  The '655 Patent

The '655 Patent lists an earliest priority claim to a foreign application filed on September 20, 2012.

The abstract of the '655 Patent provides:

> A server including a first storage module for storing possessed objects of a first user and a second user, a communication module for receiving from a device of the first user a request for transfer of an object from the first user to the second user, a second storage module for storing an object transfer relationship between the first user and the second user in response to the request for transfer, and a benefit granting module for granting a predetermined benefit to the second user if a condition for granting a benefit in relation to an object transfer relationship of the second user with other users is satisfied when an object is transferred in response to the request for transfer.

Claim 1 of the '655 Patent, an exemplary server claim, recites as follows, with disputed claim language emphasized:

> 1. A server for providing a service to a plurality of devices respectively used by a plurality of users, and communicating with the plurality of devices, the server comprising:
> a storage medium for storing ***possessed objects*** respectively possessed by the plurality of users, acquired in the service and used in the service, wherein the storage medium stores, for each of the plurality of users, ***transfer information*** indicating a transfer or a user who has transferred an object to any of the plurality of the users;
> a communication module for sending, to a device of a first user among the plurality of users, display data for selecting a first object from the possessed

6

objects possessed by the first user and selecting a second user from the plurality of users, wherein the communication module receives from the device of the first user a ***request for transfer*** of the selected first object from the first user to the second user; and

a processor configured to:

update the transfer information of the second user ***in response to the request for transfer***, for determining;

determine whether the transfer information of the second user satisfies a condition for granting a ***second object*** when the first object is transferred ***in response to the request for transfer***, for granting;

***grant the second object used in the service to the second user if the transfer information of the second user satisfies the condition for granting the second object***; and

for notifying control ***notifying the device of the second user that the first object is transferred, or that the second object is granted***.

## II.    LEGAL PRINCIPLES

### A.  Claim Construction

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To determine the meaning of the claims, courts start by considering the intrinsic evidence. *Id.* at 1313; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. The general rule—subject to certain specific exceptions discussed *infra*—is that each claim term is construed according to its ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003); *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014) (quotation marks omitted)

("There is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time.") *cert. granted, judgment vacated,* 135 S. Ct. 1846 (2015).

"The claim construction inquiry . . . begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). "[I]n all aspects of claim construction, 'the name of the game is the claim.'" *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014) (quoting *In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed. Cir. 1998)) *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015). First, a term's context in the asserted claim can be instructive. *Phillips*, 415 F.3d at 1314. Other asserted or unasserted claims can also aid in determining the claim's meaning, because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id.* For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id.* at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. "[I]t is

improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

The prosecution history is another tool to supply the proper context for claim construction because, like the specification, the prosecution history provides evidence of how the U.S. Patent and Trademark Office ("PTO") and the inventor understood the patent. *Phillips*, 415 F.3d at 1317. However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* at 1318; *see also Athletic Alts., Inc. v. Prince Mfg.*, 73 F.3d 1573, 1580 (Fed. Cir. 1996) (ambiguous prosecution history may be "unhelpful as an interpretive resource").

Although extrinsic evidence can also be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id*. at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are not helpful to a court. *Id*. Extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id*. The Supreme Court has explained the role of extrinsic evidence in claim construction:

> In some cases, however, the district court will need to look beyond the patent's
> intrinsic evidence and to consult extrinsic evidence in order to understand,
> for example, the background science or the meaning of a term in the relevant art during
> the relevant time period. *See, e.g., Seymour v. Osborne*, 11 Wall. 516, 546 (1871)
> (a patent may be "so interspersed with technical terms and terms of art that the
> testimony of scientific witnesses is indispensable to a correct understanding of its
> meaning"). In cases where those subsidiary facts are in dispute, courts will need to
> make subsidiary factual findings about that extrinsic evidence. These are the
> "evidentiary underpinnings" of claim construction that we discussed in *Markman*,
> and this subsidiary factfinding must be reviewed for clear error on appeal.

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331–32 (2015).

## B.  Departing from the Ordinary Meaning of a Claim Term

There are "only two exceptions to [the] general rule" that claim terms are construed according to their plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution."[2] *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014) (quoting *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)); *see also GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("[T]he specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal."). The standards for finding lexicography or disavowal are "exacting." *GE Lighting Sols.*, 750 F.3d at 1309.

To act as his own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term," and "clearly express an intent to define the term." *Id.* (quoting *Thorner*, 669 F.3d at 1365); *see also Renishaw*, 158 F.3d at 1249. The patentee's lexicography must appear "with reasonable clarity, deliberateness, and precision." *Renishaw*, 158 F.3d at 1249.

---

[2] Some cases have characterized other principles of claim construction as "exceptions" to the general rule, such as the statutory requirement that a means-plus-function term is construed to cover the corresponding structure disclosed in the specification. *See, e.g., CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1367 (Fed. Cir. 2002).

To disavow or disclaim the full scope of a claim term, the patentee's statements in the specification or prosecution history must amount to a "clear and unmistakable" surrender. *Cordis Corp. v. Bos. Sci. Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009); *see also Thorner*, 669 F.3d at 1366 ("The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."). "Where an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013).

## C.  Definiteness Under 35 U.S.C. § 112, ¶ 2 (pre-AIA) / § 112(b) (AIA)

Patent claims must particularly point out and distinctly claim the subject matter regarded as the invention. 35 U.S.C. § 112, ¶ 2. A claim, when viewed in light of the intrinsic evidence, must "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). If it does not, the claim fails § 112, ¶ 2 and is therefore invalid as indefinite. *Id.* at 901. Whether a claim is indefinite is determined from the perspective of one of ordinary skill in the art as of the time the application for the patent was filed. *Id.* at 911. As it is a challenge to the validity of a patent, the failure of any claim in suit to comply with § 112 must be shown by clear and convincing evidence. *BASF Corp. v. Johnson Matthey Inc.,* 875 F.3d 1360, 1365 (Fed. Cir. 2017). "[I]ndefiniteness is a question of law and in effect part of claim construction." *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012).

When a term of degree is used in a claim, "the court must determine whether the patent provides some standard for measuring that degree." *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1378 (Fed. Cir. 2015) (quotation marks omitted). Likewise, when a subjective term is used in a claim, "a court must determine whether the patent's specification supplies some standard

for measuring the scope of the [term]." *Ernie Ball, Inc. v. Earvana, LLC*, 502 F. App'x 971, 980

(Fed. Cir. 2013) (citations omitted). The standard "must provide objective boundaries for those of

skill in the art." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014).

## III.    AGREED CONSTRUCTIONS

The parties have agreed to the following constructions set forth in their Joint Claim

Construction Charts ('070 Case Dkt. No. 131; '172 Case Dkt. No. 84).

| Term[3] | Agreed Construction |
|---|---|
| "second field"<br><br>• '481 Patent Claims 1, 6, 7, 8 | a field that is different from the first field |
| "second field different from the first field"<br><br>• '481 Patent Claim 4<br>• '137 Patent Claims 8, 10, 13 | a field that is different from the first field |

Having reviewed the intrinsic and extrinsic evidence of record, the Court hereby adopts the

parties' agreed constructions.

## IV.    CONSTRUCTION OF DISPUTED TERMS

### A.    Case No. 2:19-cv-070

#### A-1.    "player character"

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "player character"<br><br>• '137 Patent Claims 1, 14, 16<br>• '481 Patent Claims 1, 7, 8 | plain and ordinary meaning | characters on the second field of the game that correspond to game contents selected by a player |

---

[3] For all term charts in this order, the listed claims are those identified by the parties in their Joint
Claim Construction Charts.

**The Parties' Positions**

Plaintiff submits: The term "player character" is composed of common words and is readily understood without construction. Defendant's proposed construction injects improper limitations. For example, the requirement that the player character be on the second field contradicts an embodiment in which player characters are displayed on the first field. '070 Case Dkt. No. 115 at 13–14.

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support its position: '137 Patent col.13 ll.20–53, col.13 ll.64–66.

Defendant responds: The '137 and '481 Patents describe the player character as exclusively displayed on the second field. This is expressed in Claims 1, 7, and 8 of the '481 Patent. And the independent claims of these patents express that the game contents correspond to the player character. '070 Case Dkt. No. 126 at 8–9.

In addition to the claims themselves, Defendant cites the following **intrinsic evidence** to support its position: '481 Patent figs.4–9, col.12 l.65, col.20 ll.41–44.

Plaintiff replies: Claim 1 of the '137 Patent expressly allows that player characters may be selected from the first field. '070 Case Dkt. No. 130 at 6.

**Analysis**

The dispute distills to whether "player character" inherently has two attributes: (1) the character is necessarily on the second field; and (2) the character necessarily corresponds to game content. The term does not inherently have these attributes.

The correspond-to-game-contents attribute advocated by Defendant expressly appears in some claims, and thus is not an inherent attribute of "player character." For example, Claim 1 of the '137 Patent recites "information on a game content corresponding to each of the player

13

characters." '137 Patent col.29 ll.34–36. The Court understands that a player character corresponds to the game content "corresponding to each of the player characters" and thus the limitation Defendant advocates is otherwise found in the claims and should not be read as an inherent attribute of "player character." *See Phillips*, 415 F.3d at 1314 ("To begin with, the context in which a term is used in the asserted claim can be highly instructive. To take a simple example, the claim in this case refers to 'steel baffles,' which strongly implies that the term 'baffles' does not inherently mean objects made of steel.").

The "player character" is not necessarily on the second field. Even if all the embodiments in the '137 and '481 Patents describe the player character as being on the second field, this is not enough to read a second-field limitation into "player character." *See Thorner*, 669 F.3d at 1366 ("It is likewise not enough that the only embodiments, or all of the embodiments, contain a particular limitation. We do not read limitations from the specification into claims; we do not redefine words. Only the patentee can do that."); *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc) ("The law does not require the impossible. Hence, it does not require that an applicant describe in his specification every conceivable and possible future embodiment of his invention."). Nothing that Defendant identifies rises to the exacting standard for lexicography or disclaimer such that a second-field limitation should be construed as inherent to the "player character."

Accordingly, the Court rejects Defendant's proposed construction and determines that "player character" has its plain and ordinary meaning without the need for further construction.

### A-2.   "game content"

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "game content"<br><br>• '137 Patent Claim 1, 14, 16<br>• '481 Patent Claim 1–5, 7, 8 | plain and ordinary meaning | an item capable of being held and selected by the player which corresponds to, but is different from, player characters |

### The Parties' Positions

Plaintiff submits: The "game content" is not necessarily distinct from "player characters." In fact, the '137 Patent describes that game contents may "include ones corresponding to identical . . . player characters." '070 Case Dkt. No. 115 at 14–15

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support its position: '137 Patent col.5 ll.16–19.

Defendant responds: The independent claims of the '137 and '481 Patents expressly recite "information on a game content corresponding to . . . the player characters" indicating that "game content" corresponds to player characters but is not the same as "player characters." Further, "game content" is defined in these patents as "denot[ing] contents or items capable of being held and managed by the player during the game" (quoting '137 Patent col.13 ll.39–44 (Defendant's modification). '070 Case Dkt. No. 126 at 7–8.

In addition to the claims themselves, Defendant cites the following **intrinsic evidence** to support its position: '137 Patent col.12 ll.62–65, col.13 ll.39–48, col.14 ll.6–8, col.14 ll.35–37, col.20 ll.44–50.

Plaintiff replies: As provided in the claims, "game content" and "player character" are not necessarily different. Indeed, Defendant recognizes this by proposing that the "a sum of the points of the player characters and/or the game content . . ." limitation means "the total amount of the

points of at least two of the selected game contents." Further, the claims already provide that that the "game content" is displayed and selected by the user, and thus it is unnecessary to specify that the "game content" may be held by the user. '070 Case Dkt. No. 130 at 6–7.

**<u>Analysis</u>**

The dispute distills to two issues. First, whether "game content" is defined in the '137 and '481 Patents. It is, but not exactly as Defendant proposes. Second, whether "game content" is necessarily different from "player characters." It is not.

The '137 and '481 Patents define "game contents" in the following passage:

> Note that the "game contents" denote contents or items capable of being held and managed by the player during the game. For example, the "game contents" include character cards, avatars, and figures corresponding to player characters to be handled in virtual game space, which is a concept including so-called "objects." Further, the "game contents" may evoke player characters directly or indirectly (such as the names of player characters, nominal designations thereof, weapons, clothes, costumes, spells, magic, moves, or associated characters). The "game contents" may be displayed as still images or moving images, or as mere character information rather than the images. In some cases, the "game contents" may not be visually recognizable or may be recognizable through the auditory sense alone such as audio information.

'137 Patent col.13 ll.39–53. Thus, the term "game contents" refers to "contents or items capable of being held and managed by the player during the game."

The term "game contents" does not necessarily refer to things that are different from the "player character." While some claims recite "information on a game content corresponding to each of the player characters" (e.g., '137 Patent Claim 1), this does not mean that a "player character" is necessarily different from "game content" in the abstract. Rather, this recites that there is "a game content" that is somehow distinct from the claimed "player character" to which it corresponds. *See Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010) ("Where a claim lists elements separately, the clear implication of the claim language is that those elements are distinct components of the patented invention." (quotation and

16

modification marks omitted)). This does not mean that every "player character" in every claim is necessarily different from any "game content." Nothing that Defendant identifies rises to the exacting standard for lexicography or disclaimer such that "game content" should be construed to exclude "player character."

Accordingly, the Court construes "game content" as follows:

- "game content(s)" means "contents or items capable of being held and managed by the player during the game, such as character cards, avatars, figures, names of player characters, nominal designations thereof, weapons, clothes, costumes, spells, magic, moves, or associated characters."

### A-3.    The Selection of Game Content Terms

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "when the player selects the desired game content"<br><br>• '137 Patent Claim 2, 15, 17 | plain and ordinary meaning | when the player touches and plays the desired game content |
| "the game content selected by the player"<br><br>• '137 Patent Claims 2, 15, 17<br>• '481 Patent Claims 1, 7, 8 | plain and ordinary meaning | the game content touched and played by the player |
| "enables selection of the new game content"<br><br>• '481 Patent Claims 1, 7 | plain and ordinary meaning | allows the player to remove the game content from the first field by touching it |
| "selection of the new game content is enabled"<br><br>• '481 Patent Claims 8 | | |
| "a selection of at least one desired game content to attack the enemy character"<br><br>• '481 Patent Claims 1, 7, 8 | plain and ordinary meaning | a touching and playing of at least one desired game content to attack the enemy character |

Because the parties' arguments and proposed constructions with respect to these terms are related, the Court addresses the terms together.

**The Parties' Positions**

Plaintiff submits: The "selecting" variants recited in these terms are not necessarily limited to the "touching" and "playing" proposed by Defendant. In fact, the '137 and '481 Patents describe that a character may be "touched and selected" indicating that "selected" does not necessarily mean "touched." '070 Case Dkt. No. 115 at 15–16.

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support its position: '481 Patent col.18 ll.23–28.

Defendant responds: Plaintiff's expert testified that "selecting" in the claims requires "touching and playing." Further, while the claims of the '137 and '481 Patents are silent as to how the "selecting" is done, the patents explain that it is done by touching. '070 Case Dkt. No. 126 at 12–13.

In addition to the claims themselves, Defendant cites the following intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '137 Patent col.26 ll.9–20, col.26 ll.37–63. **Extrinsic evidence**: Zyda Dep.[4] 100:5–16, 101:14–19, 108:22 – 111:19 (Defendant's Ex. D, '070 Case Dkt. No. 126-5 at 101–02, 109–12).

Plaintiff replies: The term "playing" does not appear in the claims and should not be read into the construction of "selecting." Further, Plaintiff's expert did not testify that "selecting" necessarily includes "touching and playing" but rather distinguished "selecting" and "playing." '070 Case Dkt. No. 130 at 7–8.

---

[4] Video Deposition of Michael Zyda, Ph.D. (Dec. 17, 2019).

Plaintiff cites further **extrinsic evidence** to support its position: Zyda Dep. 101:6–8, 107:6 – 108:4, 111:16–19 (Defendant's Ex. D, '070 Case Dkt. No. 126-5 at 102, 108–09, 112).

**<u>Analysis</u>**

The issue in dispute is whether "selecting" and variants in these terms necessarily entail touching and playing. They do not.

The game content is not necessarily "selected" by touching and playing. Even if all the embodiments in the '137 and '481 Patents describe selecting as including touching and playing, this is not enough to read a touch-and-play limitation into "selecting" or variants. *Thorner*, 669 F.3d at 1366 ("It is likewise not enough that the only embodiments, or all of the embodiments, contain a particular limitation. We do not read limitations from the specification into claims; we do not redefine words. Only the patentee can do that."); *SRI Int'l*, 775 F.2d at 1121 ("The law does not require the impossible. Hence, it does not require that an applicant describe in his specification every conceivable and possible future embodiment of his invention."). Nothing that Defendant identifies rises to the exacting standard for lexicography or disclaimer such that "selecting" (and variants) of game content should be construed to inherently include a touch-and-play limitation.

Further, the claims themselves do not need to explain how each step is done. Defendant's argument suggests that a method step is necessarily limited to the details disclosed in the description of the embodiments of the invention. This is the standard for step-plus-function claiming under 35 U.S.C. § 112(f), but Defendant has established neither that § 112(f) applies to the claims at issue nor that this standard should apply in the absence of § 112(f).

Ultimately, "select" as well as its variants are broad but plainly understandable terms. Accordingly, the Court rejects Defendant's proposed construction and determines that these terms have their plain and ordinary meanings without the need for further construction.

### A-4.    The "Point" and "Parameter Value" Terms

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "point"<br><br>• '137 Patent Claims 1, 14, 16 | plain and ordinary meaning | an individual consumption cost of selecting |
| "second parameter value"<br><br>• '481 Patent Claims 1, 7, 8 | plain and ordinary meaning | |
| "an upper limit of a point set for the battle or the predetermined battle event"<br><br>• '137 Patent Claims 1, 14, 16 | plain and ordinary meaning | a total cost available for selecting game content |
| "information on a third parameter value for the predetermined battle event"<br><br>• '481 Patent Claims 1, 7, 8 | plain and ordinary meaning | information on a total cost available for selecting game content(s) for the predetermined battle event |

Because the parties' arguments and proposed constructions with respect to these terms are related, the Court addresses the terms together.

### The Parties' Positions

Plaintiff submits: The '137 and '481 Patents describe that the parameters may be used to represent the strength of a move and that the "second parameter" and "third parameter" values correspond to an action point. Further, the "third parameter" may correspond to the "total cost available for selecting game content." The patents do not, however, restrict the claims to these embodiments. The "point" and "parameter" terms are composed of ordinary words that are readily understandable without construction. '070 Case Dkt. No. 115 at 16–20.

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support its position: '137 Patent col.5 ll.4–8, col.15 ll.4–14, col.15 ll.33–37, col.21 ll.55–58, col.21 ll.60–67, col.28 l.52 – col.29 l.2; '481 Patent col.7 ll.11–18.

Defendant responds: The claims of the '137 and '481 Patents describe the "point" and "second parameter value" as the cost of selecting content in that they provide that the system "sequentially subtract[s] the point of the selected game content from the upper limit of the point" ('137 Patent) and "sequentially subtract[s] the second parameter value of the selected game content from the third parameter value" ('481 Patent). Further, the patents define the "third parameter value" and "upper limit" as the "total cost available for selecting desired game contents from the first field" (quoting '137 Patent col.15 ll.4–8). '070 Case Dkt. No. 126 at 9–11.

In addition to the claims themselves, Defendant cites the following intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '137 Patent col.14 l.62 – col.15 l.14, col.15 ll.33–40, col.15 ll.47–52, col.21 ll.55–67. **Extrinsic evidence**: Zyda Report[5] ¶¶ 36, 39 (Defendant's Ex. C, '070 Dkt. No. 126-4); Zyda Dep. 98:19 – 99:16, 100:15–16, 105:7 – 106:18, 107:6 – 108:4, 111:16–19 (Defendant's Ex. D, '070 Dkt. No. 126-5 at 99–101, 106–09, 112).

Plaintiff replies: Defendant's proposed constructions are superfluous and clarify nothing. The claims are clear regarding what "point," "second parameter," "upper limit of the point," and "third parameter" are and what is done with them. Defendant's constructions would replace clear claim language with less accessible language and the constructions threaten to limit the claims to an exemplary embodiment. '070 Case Dkt. No. 130 at 8–10.

<u>**Analysis**</u>

The dispute distills to whether the claim language should be rewritten to limit the claim terms to consumption costs. They should not.

To begin, the Court again rejects Defendant's attempt to incorporate limitations elsewhere expressed in the claims as inherent attributes of the "point" and "second parameter" terms. *Phillips*,

---

[5] Expert Report of Dr. Michael Zyda Regarding the Construction of Certain Claim Terms.

415 F.3d at 1314 ("To begin with, the context in which a term is used in the asserted claim can be highly instructive. To take a simple example, the claim in this case refers to 'steel baffles,' which strongly implies that the term 'baffles' does not inherently mean objects made of steel."). Thus, that "point" or "second parameter value" are expressed in the claims as something associated with the game content that is subtracted from some value when the game content is selected suggests that the "point" or "second parameter value" are not inherently limited to this attribute . *See, e.g.*, '137 Patent col.29 ll.50–51 ("sequentially subtracts the point of the selected game content from the upper limit of the point"); '481 Patent col.21 ll.29–31 ("sequentially subtracts the second parameter value of the selected game content from the third parameter value"). Ultimately, the character and role of the "point" and "second parameter value" terms in the claims are plain in the context of the surrounding claim language. *See, e.g.*, '137 Patent col.29 ll.36–37 ("a point set for each of the player characters and/or each of the game contents"), col.29 ll.50–51 (quoted above); '481 Patent col.21 ll.15–17 ("information on a second parameter value for each of the player characters and/or each of the game contents"), col.21 ll.29–31 (quoted above).

The "upper limit" and "third parameter" terms would benefit from construction, however. The parties appear to agree that the "third parameter value" refers to an upper limit that is set for the battle or battle event. And the description supports such a construction. *See, e.g.*, '137 Patent col.14 l.62 – col.15 l.17 (describing the "third parameter value" as "the total cost available for selecting desired game contents from the first field (to form a deck) is first ***assigned to (set for)*** each player (user) participating in the battle event" (emphasis added).)

Accordingly, the Court rejects Defendant's proposed constructions, determines that "point" and "second parameter value" have their plain and ordinary meanings without the need for further construction, and construes the upper-limit and third-parameter terms as follows:

22

- "an upper limit of a point set for the battle or the predetermined battle event" means
  "an upper limit of a value that is set for the battle or the predetermined battle event";
  and

- "information on a third parameter value for the predetermined battle event" means
  "information on an upper limit of a value for the predetermined battle event."

### A-5.   "when a sum of the points …"

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "when a sum of the points of the player characters and/or the game content selected by the player is less than or equal to the upper limit of the point"<br><br>• '137 Patent Claim 1 | plain and ordinary meaning | only if the total amount of the points of at least two of the selected game contents is less than or equal to the total cost available for selecting game content |
| "when a sum of the points of the player characters and/or the game content selected by the player is less than or equal to an upper limit of the point, permitting the player to select the game contents"<br><br>• '137 Patent Claims 14, 16 | | |

Because the parties' arguments and proposed constructions with respect to these terms are related, the Court addresses the terms together.

**<u>The Parties' Positions</u>**

Plaintiff submits: The meanings of these terms are readily apparent when read in the context of the surrounding claim language. There is no need to construe them. And Defendant's proposed construction improperly removes the "player characters" from the terms. '070 Case Dkt. No. 115 at 20–21.

Defendant responds: While the claims do not provide how the "sum" is determined, the '137 Patent describes "the summing process exclusively as involving multiple game contents selected by the player." '070 Case Dkt. No. 126 at 13.

In addition to the claims themselves, Defendant cites the following **intrinsic evidence** to support its position: '137 Patent col.14 l.67 – col.15 l.4, col.15 ll.33–40, col.21 ll.49–54, col.26 ll.33–36, col.28 ll.59–63, col.28 l.66 – col.29 l.4.

Plaintiff replies: Defendant's proposed construction contradicts the plain claim language. For example, Claim 1 specifically allows that a player may select only one game content ("the player can select at least one desired game content") and Defendant's proposed construction requires selection of at least two game contents. '070 Case Dkt. No. 130 at 10.

<u>**Analysis**</u>

The issue in dispute distills to whether the summing process of the claims is necessarily limited to summing multiple selected game contents. It is not.

The Court again rejects Defendant's proposal to read the details of "how" a claim step is performed from the described embodiments into the claims. Defendant has not cited any law that supports importing such details from the description of the invention into the claims. Even if the only "summing" described in the '137 Patent is the summing of two game contents, this is not enough to require such in the claims. *Thorner*, 669 F.3d at 1366 ("It is likewise not enough that the only embodiments, or all of the embodiments, contain a particular limitation. We do not read limitations from the specification into claims; we do not redefine words. Only the patentee can do that."). Further, Defendant's proposed construction would require the selection of at least two game contents when the claims specify "that the player can select at least one desired game content." '137 Patent col.29 ll.41–42 (Claim 1), col.31 ll.51–52 (Claim 14), col.32 ll.35–36 (Claim

24

16). Finally, the plain language of the claims specifies what is summed: "sum of the points of the player characters and/or the game content selected by the player."

Accordingly, the Court rejects Defendant's proposed construction and determines that these terms have their plain and ordinary meanings without the need for further construction.

### A-6.   "at appropriate timing"

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "at appropriate timing"<br><br>• '137 Patent Claims 1, 14, 16<br>• '481 Patent Claims 1, 7, 8 | plain and ordinary meaning | indefinite |

**The Parties' Positions**

Plaintiff submits: the "appropriate timing" of the claims is the event timing designed into the game. Both Plaintiff's expert here and Defendant's expert in an Inter Partes Review proceeding have opined that this term is understandable. '070 Case Dkt. No. 115 at 22–23.

In addition to the claims themselves, Plaintiff cites the following intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '137 Patent col.15 ll.47–61. **Extrinsic evidence**: Zyda Dep. 112:23 – 113:20 (Plaintiff's Ex. B, '070 Case Dkt. No. 115-2 at 12–13); Petition for Inter Partes Review of U.S. Patent No. 9,604,137 at 41, *Supercell Oy v. GREE, Inc.*, IPR2019-00754 (P.T.A.B. Mar. 1, 2019), Paper No. 1 (Plaintiff's Ex. A, '070 Case Dkt. No. 115-1

at 15);[6] Friedman IPR Decl.[7] ¶ 96, *Supercell Oy v. GREE, Inc.*, IPR2019-00754 (P.T.A.B. Mar. 1, 2019), Exhibit No. 1003 (Plaintiff's Ex. D, '070 Case Dkt. No. 115-4).

Defendant responds: The term "appropriate timing" is subjective and the '137 and '481 Patents do not provide any objective standard for determining the scope. The "appropriate timing" is thus subject to the vagaries of the game-designer's opinion and the meaning is therefore indefinite. '070 Case Dkt. No. 126 at 14–16.

In addition to the claims themselves, Defendant cites the following intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '137 Patent col.15 ll.52–61. **Extrinsic evidence**: Friedman Decl.[8] ¶¶ 56–57, 60–61 (Defendant's Ex. E, '070 Case Dkt. No. 126-6); Friedman Dep.[9] 27:24 – 29:9 (Defendant's Ex. F, '070 Case Dkt. No. 126-7 at 6–8); Zyda Dep. 116:4–6, 116:22–25, 117:2–8 (Defendant's Ex. D, '070 Case Dkt. No. 126-5 at 117–18); Petition for Inter Partes Review of U.S. Patent No. 9,604,137 at 11 n.1, *Supercell Oy v. GREE, Inc.*, IPR2019-00754 (P.T.A.B. Mar. 1, 2019), Paper No. 1 (Plaintiff's Ex. A, '070 Case Dkt. No. 115-1 at 4).

Plaintiff replies: The "appropriate timing" is set forth in the claims and described in the patent as a time after the player selects game contents, and thus is after the start of the turn and before the end of the turn. '070 Case Dkt. No. 130 at 11–12.

---

[6] The Court treats petitioner's submissions in an Inter Partes Review as extrinsic evidence because these submissions do not necessarily reflect the patent owner's or the PTO's understanding of the patent. *See Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1359–61 (Fed. Cir. 2017) (holding that "***statements made by a patent owner*** during an IPR proceeding can be considered during claim construction and relied upon to support a finding of prosecution disclaimer" (emphasis added)); *Phillips*, 415 F.3d at 1317 ("Like the specification, the prosecution history provides evidence of ***how the PTO and the inventor understood the patent***." (emphasis added)).

[7] Declaration of Stacy Friedman in Support of Petition for Inter Partes Review of U.S. Patent No. 9,604,137.

[8] Declaration of Stacy Friedman in Support of Defendant's Claim Constructions.

[9] Deposition of Stacy Friedman (Dec. 13, 2019).

Plaintiff cites further **intrinsic evidence** to support its position: '137 Patent fig.3.

**<u>Analysis</u>**

The issue in dispute is whether the meaning of "at appropriate timing" is reasonably certain in the context of the claims and description of the '137 and '481 Patents. It is.

What constitutes "appropriate" timing is set forth in the '137 and '481 Patents with reasonable certainty. Specifically, the patents provide that the "appropriate" timing is "not particularly limited," indicating that it must exist, but it need not be any particular time:

> Further, in this case, the control unit may sequentially subtract the second parameter value of the game content selected by the player from the third parameter value, and add a predetermined amount to the third parameter value at ***appropriate timing*** or restore the upper limit of the third parameter value. The "appropriate timing" is ***not particularly limited***. For example, as mentioned above, when the predetermined battle event is composed of multiple matches (turns), the upper limit of the third parameter value may be restored as time passes in the middle of each turn. Alternatively, the upper limit of the third parameter value may be restored based on the damage given by the player character to the enemy character. Instead of or in addition to this, compiled values as the third parameter value may be restored at the start or end of the turn.

'137 Patent col.15 ll.47–61 (emphasis added). In the context of this description, and of the surrounding claim language, the "appropriate timing" is when a predetermined amount is added to the upper limit or the third parameter value sequentially with subtracting an amount from the upper limit or the third parameter value. *See, e.g.*, '137 Patent col.29 ll.50–53 (Claim 1 reciting: "the controller sequentially subtracts the point of the selected game content from the upper limit of the point, and adds a predetermined amount to the upper limit of the point at appropriate timing"); '481 Patent col.21 ll.26–36 (Claim 1 reciting: "a control unit that . . . sequentially subtracts the second parameter value of the selected game content from the third parameter value, and adds a predetermined amount to the third parameter value at appropriate timing"). This timing is not a particular timing, but it is the timing set in the game; in other words, it is determined before the predetermined amount is added. While this is broad, this is not indefinite. *BASF Corp.*, 875 F.3d

at 1367 ("the inference of indefiniteness simply from [a broad] scope finding is legally incorrect: breadth is not indefiniteness" (quotation marks omitted)).

Accordingly, Defendant has failed to establish any claim is indefinite for including "at appropriate timing" and construes the term as follows:

- "at appropriate timing" means "at a predetermined time."

### A-7. "in a state being identical to or different from the state of being displayed in the first field"

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
| --- | --- | --- |
| "in a state being identical to or different from the state of being displayed in the first field"<br><br>• '137 Patent Claims 8, 10, 13 | plain and ordinary meaning | indefinite |

### The Parties' Positions

Plaintiff submits: Claims 8, 10, and 13 of the '137 Patent expressly allow the controller to redisplay the selected game content in the second field in any state, regardless of "how displayed in the first field." While broad, this is not indefinite. In fact, Defendant's expert in an Inter Partes Review proceeding sufficiently understood the scope of this term to identify prior art that allegedly falls within its scope. '070 Case Dkt. No. 115 at 23–24.

In addition to the claims themselves, Plaintiff cites the following intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '137 Patent col.16 ll.34–39. **Extrinsic evidence**: Petition for Inter Partes Review of U.S. Patent No. 9,604,137 at 46, *Supercell Oy v. GREE, Inc.*, IPR2019-00754 (P.T.A.B. Mar. 1, 2019), Paper No. 1 (Plaintiff's Ex. A, '070 Case Dkt. No. 115-1 at 18); Friedman IPR Decl. ¶¶ 101, 137, 140, *Supercell Oy v. GREE, Inc.*, IPR2019-00754 (P.T.A.B. Mar. 1, 2019), Exhibit No. 1003 (Plaintiff's Ex. D, '070 Case Dkt. No. 115-4).

Defendant responds: The term is a tautology and therefore does not limit the claims. As such, it is indefinite. '070 Case Dkt. No. 126 at 16.

In addition to the claims themselves, Defendant cites the following **extrinsic evidence** to support its position: Friedman Decl. ¶¶ 64–65 (Defendant's Ex. E, Dkt. No. 126-6); Petition for Inter Partes Review of U.S. Patent No. 9,604,137 at 11 n.1, *Supercell Oy v. GREE, Inc.*, IPR2019-00754 (P.T.A.B. Mar. 1, 2019), Paper No. 1 (Plaintiff's Ex. A, '070 Case Dkt. No. 115-1 at 4).

Plaintiff replies: This term appears in dependent claims that recite other limitations. Thus, the dependent claims further limit the claims from which they depend, even though the claims otherwise cover any state. '070 Case Dkt. No. 130 at 12.

**Analysis**

The issue in dispute is whether the scope of "in a state being identical to or different from the state of being displayed in the first field" is not reasonably certain because it covers all states. While broad, the meaning is reasonably certain.

This term, while broad, is not indefinite. To begin, not every term found in a claim is necessarily limiting. For example, the Federal Circuit has instructed that a "'whereby' clause that merely states the result of the limitations in the claim **adds nothing to the patentability or substance** of the claim" and that "clauses [that] merely describe the result of arranging the components of the claims in the manner recited in the claims . . . **do not contain any limitations**." *Tex. Instruments Inc. v. U.S. Int'l Trade Comm'n*, 988 F.2d 1165, 1172 (Fed. Cir. 1993) (emphasis added). Similarly, the Federal Circuit has instructed that a claim-recited "intended use or purpose usually will not limit the scope of the claim because such statements usually do no more than define a context in which the invention operates." *Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 320 F.3d 1339, 1345 (Fed. Cir. 2003); *see also In re Stencel*, 828 F.2d

751, 754 (Fed. Cir. 1987) (noting that "such [non-limiting] statements often, although not necessarily, appear in the claim's preamble"). In other words, instead of invalidating patent claims for inclusion of non-limiting words, the Federal Circuit has endorsed the practice of including non-limiting words in a claim to provide context or clarity. Further, the Federal Circuit has instructed that the inclusion of unlimited claim language does not for that reason render a claim indefinite. *BASF Corp.*, 875 F.3d at 1367 (holding that a claim limitation that would encompass "a practically limitless number of materials" does not necessarily render a claim indefinite, instructing that "the inference of indefiniteness simply from the scope finding is legally incorrect: breadth is not indefiniteness" (quotation marks omitted)).

Accordingly, Defendant has failed to establish any claim is indefinite for including "at appropriate timing" and the Court determines that the term has its plain and ordinary meaning without the need for further construction.

### A-8.   "possessed objects"

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "possessed objects"<br><br>• '655 Patent Claims 1, 7, 8 | plain and ordinary meaning | items possessed within the service by a user, including a user's hair styles, clothes, accessories, goods, and backgrounds |

**The Parties' Positions**

Plaintiff submits: The meaning of this term is readily apparent without construction. Defendant's proposed construction includes examples of objects that provide no clarity and instead threaten to improperly limit the claims by importing limitations from the described embodiments. '070 Case Dkt. No. 115 at 25–26.

Defendant responds: The "objects" of the claims are equated with "items" in the '655 Patent's description and "items" are defined as "including a user's hair styles, clothes, accessories, goods, and backgrounds." '070 Case Dkt. No. 126 at 18–19.

In addition to the claims themselves, Defendant cites the following **intrinsic evidence** to support its position: '655 Patent col.1 ll.36–52, col.6 ll.12–14.

Plaintiff replies: Defendant's construction improperly confuses claim scope and imports limitations from the described embodiments. '070 Case Dkt. No. 130 at 13.

**<u>Analysis</u>**

The issue in dispute is whether "objects" is defined in the '655 Patent as limited to "items including a user's hair styles, clothes, accessories, goods, and backgrounds." It is not, items such as "hair styles, clothes, accessories, goods, and backgrounds" are examples of the claim-recited objects.

The claims themselves provide significant guidance regarding the nature of the "possessed objects." For example, Claim 1 of the '655 Patent provides the following:

- "a storage medium for storing possessed objects respectively possessed by the plurality of users, acquired in the service and used in the service," '655 Patent col.17 ll.15–17,

- "a communication module for sending, to a device of a first user among the plurality of users, display data for selecting a first object from the possessed objects possessed by the first user and selecting a second user from the plurality of users," *id*. at col.17 ll.22–26, and

- "wherein the communication module receives from the device of the first user a request for transfer of the selected first object from the first user to the second user," *id*. at col.17 ll.26–29.

Claims 7 and 8 include similar limitations. Thus, where the possessed objects are stored and what are done with them are specified plainly in the claims.

While the Court understands "objects" here to be a broad term with several potential plain meanings, the '655 Patent provides examples that may be useful to understanding the "possessed objects" of the claims. For example, the patent provides that "server 3 manages the user's avatar, ***possessed items***, posted messages, and other users in a friend relationship with the user." *Id*. at col.6 ll.12–14 (emphasis added). In fact, all the "possessed" objects of the description of the embodiments of the invention are "possessed ***items***." From this, the Court understands that "object" in the claims is used according to its plain meaning that is synonymous with "item." In other words, the "possessed object" of the claims refers to an item. And "item" is used broadly in the patent. For example, in the context of explaining the types of things a user's avatar (the user's alter ego in the game) may possess, the patent provides:

> Coordinating an avatar's ***items including hair styles, clothes, accessories, goods, and backgrounds*** is now one of important activities for a user to draw attention to his/her own senses and preferences in a network community. Users are thus getting or buying these items or giving them to their friends as gifts, which means coordinating avatar items is now one target of economic activity (Patent Literature 1, for example).

'655 Patent col.1 ll.36–53 (emphasis added).

Accordingly, the Court construes "possessed objects" as follows:

- "possessed objects" means "items, such as hair styles, clothes, accessories, goods, and backgrounds."

### A-9.   "request for transfer"

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "request for transfer"<br><br>• '655 Patent Claims 1, 7, 8 | plain and ordinary meaning | request sent from a user device to the server to execute a transfer [of the selected first object from the first user to the second user] |

### The Parties' Positions

Plaintiff submits: The meaning of this term is readily apparent in the context of the claims. Instead of clarifying claim scope, Defendant's proposed construction adds redundant references to limitations expressed in the claims. '070 Case Dkt. No. 115 at 26.

Defendant responds: The independent claims of the '655 Patent express that the server is configured to "receiv[e] from the device of the first user a request for transfer of the selected first object from the first user to the second user" and that the server executes the request by "updat[ing] the transfer information of the second user in response" (Defendant's modifications). Thus, the "request for transfer" is from a user device to a server to execute a transfer. '070 Case Dkt. No. 126 at 19–20.

In addition to the claims themselves, Defendant cites the following **intrinsic evidence** to support its position: '655 Patent col.1 ll.18–19.

Plaintiff replies: The meaning of "request for transfer" is plain without construction. '070 Case Dkt. No. 130 at 13.

### Analysis

The issue in dispute appears to be simply whether "request for transfer" should be rewritten to incorporate other expressed limitations. It should not.

The claims of the '655 Patent plainly express the nature of the "request for transfer." For example:

- Claim 1 recites: "the server comprising: . . . a communication module . . . the communication module receives from the device of the first user a ***request for transfer*** of the selected first object from the first user to the second user; a processor configured to: update the transfer information of the second user in response to the ***request for transfer*** . . . a processor configured to: [perform a function] when the first object is transferred in response to the ***request for transfer***, for granting" (emphasis added).

- Claim 7 recites: "A method for controlling a server . . . the method comprising: receiving from the device of the first user a ***request for transfer*** of the selected first object from the first user to the second user; updating the transfer information of the second user in response to the ***request for transfer*** . . . [performing a function] when the first object is transferred in response to the ***request for transfer***" (emphasis added).

- Claim 8 recites: "A computer-readable, non-transitory medium storing a control program for a server . . . wherein the control program causes the server to execute a process, the process comprising: receiving from the device of the first user a ***request for transfer*** of the selected first object from the first user to the second user; updating the transfer information of the second user in response to the ***request for transfer*** . . . [performing a function] when the first object is transferred in response to the ***request for transfer***" (emphasis added).

34

The roles and relationships of the server, the user device, and the "request for transfer" are clearly set forth in the claims.

Accordingly, the Court rejects Defendant's proposal to rewrite the claim language and determines that "request for transfer" has its plain and ordinary meaning without the need for further construction.

### A-10.   "in response to the request for transfer"

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "in response to the request for transfer"<br><br>• '655 Patent Claims 1, 7, 8 | upon receipt of the request for transfer | in response to the request sent from a user device to the server to execute a transfer [of the selected first object from the first user to the second user] |

### The Parties' Positions

Plaintiff submits: The term "in response to the request for transfer" should be construed to clarify that, in the claims, the "transfer information of the second user" is updated on receipt of the request. '070 Case Dkt. No. 115 at 26–27.

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support its position: '655 Patent col.9 ll.41–48.

Defendant responds: Changing "in response to" to "upon receipt of" improperly changes the meaning the claim language rather than clarifying it. '070 Case Dkt. No. 126 at 20.

Plaintiff replies: Construing "in response to" as "upon receipt of" clarifies that updating the second user's transfer information proceeds without intervening steps when the request is received. '070 Case Dkt. No. 130 at 13–14.

**Analysis**

The issue in dispute distills to whether "in response to" necessarily means "upon receipt of." It does not.

Plaintiff attempts to rewrite broad claim language but has not met the exacting standard for doing so. Specifically, the claim language "in response to" is plainly broader than "upon receipt of." And Plaintiff has not identified anything that rises to the exacting standard of lexicography or disclaimer to justify limiting "in response to" to "upon receipt of." Thus, the Court rejects Plaintiff's proposal.

Defendant's proposed construction simply reiterates its proposal for "request for transfer." For the reasons stated above in the section of "request for transfer," the Court rejects Defendant's proposal.

Accordingly, the Court rejects the parties' proposed constructions and determines that "in response to the request for transfer" has its plain and ordinary meaning without the need for further construction.

### A-11.  "second object"

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "second object"<br><br>• '655 Patent Claims 1–8 | plain and ordinary meaning | a predetermined item used in the service granted to the second user if that user's transfer information satisfies a predetermined condition |

**The Parties' Positions**

Plaintiff submits: The meaning of "second object" is readily apparent without construction. Defendant's proposal improperly injects a number of limitations instead of clarifying claim scope.

For example, neither the "second object" nor the condition on which it is granted is necessarily "predetermined." '070 Case Dkt. No. 115 at 27–28.

Defendant responds: As with "possessed objects," the "second object" should be construed to clarify the "object" is an "item." And as repeatedly explained in the '655 Patent, the "second object" is a "predetermined item" granted on a "predetermined condition." '070 Case Dkt. No. 126 at 20–21.

In addition to the claims themselves, Defendant cites the following **intrinsic evidence** to support its position: '655 Patent, at [57] Abstract, col.2 ll.27–32, col.4 ll.24–27, col.9 l.64 – col.10 l.5, col.13 ll.12–20, col.14 ll.50–57, col.15 ll.60–64.

Plaintiff replies: Even if all the embodiments of the "second object" are "predetermined" and granted on satisfaction of a "predetermined" condition, it would be improper to read "predetermined" into the claims as Defendant proposes. Further, the '655 Patent describes granting an item on satisfaction of a condition that is not described as predetermined. '070 Case Dkt. No. 130 at 14.

Plaintiff cites further **intrinsic evidence** to support its position: '655 Patent, at [57] Abstract.

**<u>Analysis</u>**

The issues in dispute distill to whether the second object is necessarily a "predetermined" item granted on satisfaction of a "predetermined" condition. It is not.

The claims of the '655 Patent provide significant guidance regarding the nature of the "second object" and when it granted. For example:

- Claim 1 recites: "the server comprising: . . . a processor configured to: . . . determine whether the transfer information of the second user ***<u>satisfies a condition for granting</u>*** a ***second object*** when the first object is transferred in response to the request for

transfer, for granting; ***grant*** the ***second object*** used in the service to the second user if

the transfer information of the second user ***satisfies the condition for granting the***

***second object***" (emphasis added).

- Claim 7 recites: "A method for controlling a server . . . the method comprising: . . .

  determining whether the transfer information of the second user ***satisfies a condition***

  ***for granting*** a ***second object*** when the first object is transferred in response to the

  request for transfer; ***granting***, by the server, the ***second object*** used in the service to

  the second user when the transfer information of the second user ***satisfies the***

  ***condition for granting the second object***" (emphasis added).

- Claim 8 recites: "A computer-readable, non-transitory medium storing a control

  program for a server . . . wherein the control program causes the server to execute a

  process, the process comprising: . . . determining whether the transfer information of

  the second user ***satisfies a condition for granting*** a ***second object*** when the first

  object is transferred in response to the request for transfer; ***granting*** the ***second object***

  used in the services to the second user when the transfer information of the second

  user ***satisfies the condition for granting the second object***" (emphasis added).

The Court rejects Defendant's proposed "predetermined" limitations. Notably, the claims

provide significant detail regarding the grant of the second object and the condition for the granting

the second object. The claims do not, however, specify that either the condition or the second

object itself is somehow "predetermined." In fact, the '655 Patent does not uniformly refer to the

condition or that which is conferred on satisfaction of the condition as "predetermined." At times

the patent does provide: "a benefit granting module for granting a ***predetermined benefit*** to the

second user if ***a condition*** for granting a benefit in relation to an object transfer relationship of the

second user with other users is satisfied." *Id*. at col.2 ll.27–32 (emphasis added). In this example, the benefit granted is described as "predetermined" but the grant condition is not. In another example, the patent provides: "if a ***predetermined* condition** for granting an item is satisfied with regard to the other user owing to the item transfer, the server grants the ***predetermined* item** to the other user." *Id*. at col. 4 ll.24–27. The patent describes the granted item/benefit in some examples as "predetermined" and in others as not and the patent describes the grant condition in some examples as "predetermined" and in others as not. This strongly suggests that the "condition" of the claims and the "second item" of the claims are not necessarily "predetermined."

For the reasons set forth in the section on "possessed objects," the Court understands that the second object, like a possessed object, is an "item." Further, as the "second object" is recited distinctly from the "first object" in the claims, the court understands that these are distinct objects. *See Becton, Dickinson & Co.*, 616 F.3d at 1254 ("Where a claim lists elements separately, the clear implication of the claim language is that those elements are distinct components of the patented invention." (quotation and modification marks omitted)). To be clear, this does not mean that the first and second objects cannot be of the same type, they just cannot be the same singular object.

Accordingly, the Court construes "second object" as follows:

- "second object" means "item that is distinct from the first object".

### A-12.   "transfer information"

| Disputed Term[10] | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "transfer information"<br><br>• '655 Patent Claims 1, 7, 8 | plain and ordinary meaning | a user's stored information or database records representing an object transfer between two users or a user who has transferred an object to another user |

#### The Parties' Positions

Plaintiff submits: The meaning of "transfer information" is readily apparent without construction. Defendant's proposed construction improperly limits the information to information representing a "transfer between two users" when the claims express the information may represent a transfer to "any of the plurality of the users." Further, Defendant's proposed construction improperly incorporates surrounding claim language, which is both unnecessary and confusing. '070 Case Dkt. No. 115 at 28–29.

Defendant responds: The claims expressly recite "transfer information [as] indicating a transfer or a user who has transferred an object to any of the plurality of the users" and Defendant's proposed construction provides "terminology more easily accessible to a lay juror." Further, the claims do not specify how the transfer information is stored or how the information is used to determine whether the claim-recited condition for granting the second object is satisfied. As explained in the '655 Patent, the transfer information is stored as database records representing an object transferred between two users. The "records" are counted, and if the count is greater than a

---

[10] The parties identified this term as "the transfer information" in the summary chart provided in their Joint Claim Construction Chart, Dkt. No. 131 at 4, but charted it as "transfer information" in the detailed chart for the '655 Patent in Exhibit C to their Joint Claim Construction Chart, *see, e,g.*, Dkt. No. 131-2 at 2.

predetermined value, the second-object grant condition is satisfied. '070 Case Dkt. No. 126 at 21–22.

In addition to the claims themselves, Defendant cites the following **intrinsic evidence** to support its position: '655 Patent col.6 ll.40–44, col.6 ll.56–59, col.9 l.41 – col.10 l.15.

Plaintiff replies: The claims do not need to specify how the transfer information is stored and used. It is improper to read into the claims described specifics regarding how the information is stored and used when such are not expressed in the claims. '070 Case Dkt. No. 130 at 14–15.

<u>**Analysis**</u>

The issues in dispute distill to whether "transfer information" must be construed to specify how the information is stored. It should not.

The claims of the '655 Patent plainly express the nature of the "transfer information." For example:

- Claim 1 recites: "the server comprising: . . . a storage medium . . . wherein the storage medium stores, ***<u>for each of the plurality of users</u>***, ***transfer information <u>indicating</u>*** a transfer or a user who has transferred an object to any of the plurality of the users" (emphasis added).

- Claim 7 recites: "A method for controlling a server . . . the method comprising: . . . storing, ***<u>for each of the plurality of users</u>***, ***transfer information <u>indicating</u>*** a transfer or a user who has transferred an object to any of the plurality of the users in the storage module" (emphasis added).

- Claim 8 recites: "A computer-readable, non-transitory medium storing a control program for a server . . . wherein the control program causes the server to execute a process, the process comprising: storing, ***<u>for each of the plurality of users</u>***, ***transfer***

> ***information *indicating*** a transfer or a user who has transferred an object to any of the plurality of the users in the storage medium" (emphasis added).

The claims plainly and expressly state what the transfer information indicates and that it is stored for the users. There is no need to construe "transfer information" to clarify or change this, as Defendant proposes.

The Court also rejects Defendant's attempt to read in "how" the transfer information is stored (and how the system determines whether the grant condition is satisfied). Again, Defendant's proposal supplants the clear and broad claim language "stores" and "storing" with details from the described embodiments. Defendant has not identified anything that rises to the exacting standard required to replace the plain claim language with specifics from the description of the described embodiments.

Accordingly, the Court rejects Defendant's proposed construction and determines that "transfer information" has its plain and ordinary meaning without the need for further construction.

### A-13.   "grant the second object …," "granting, by the server, the second object …," and "granting the second object …"

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "grant the second object used in the service to the second user if the transfer information of the second user satisfies the condition for granting the second object"<br><br>• '655 Patent Claims 1 | plain and ordinary meaning | the server automatically confer[s / ring] a bonus item [or second object] on the second user if the second user's transfer information satisfies the condition for awarding a bonus item [or second object] |
| "granting, by the server, the second object used in the service to the second user when the transfer information of the second user satisfies the condition for granting the second object"<br><br>• '655 Patent Claim 7 | | |

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "granting the second object used in the services to the second user when the transfer information of the second user satisfies the condition for granting the second object"<br><br>• '655 Patent Claim 8 | | |
| "the condition for granting the second object"<br><br>• '655 Patent Claims 1, 7, 8 | plain and ordinary meaning | the threshold count of a user's transfer information required to satisfy the predetermined condition for automatically conferring a bonus item [or second object] on the second user |

Because the parties' arguments and proposed constructions with respect to these terms are related, the Court addresses the terms together.

**The Parties' Positions**

Plaintiff submits: The meanings of these terms are readily apparent without construction. Defendant's propose a number of improper limitations. For example, a "second object" is not necessarily a "bonus item." Likewise, "grant the second object" does not necessarily mean the "server automatically confers a bonus item." And the grant "condition" is not necessarily "the threshold count of a user's transfer information required to satisfy the predetermined condition." '070 Case Dkt. No. 115 at 29–30.

Defendant responds: The '655 Patent explains that the "transfer information" is stored as database records, these records are counted, and the count must reach a predetermined value to satisfy the grant condition. If the grant condition is met, the second object is automatically conferred to the second user. '070 Case Dkt. No. 126 at 22–23.

43

In addition to the claims themselves, Defendant cites the following intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '655 Patent col.10 ll.9–15. **Extrinsic evidence**: *The American Heritage Dictionary* at 368 (5th ed. 2012), "grant" (Defendant's Ex. H, '070 Case Dkt. No. 126-9 at 7); Takeuchi Dep. Vol.1[11] at 59:21–24 (Defendant's Ex. J, '070 Case Dkt. No. 126-11 at 9).

Plaintiff replies: Defendant's proposed construction improperly imports limitations from described embodiments and uses words not found the intrinsic record. '070 Case Dkt. No. 130 at 15–16.

### Analysis

The dispute distills to two issues. The first issue is whether the claim-recited grant of a second object is necessarily performed automatically by the server. While the claims specify the grant is by the server, the claims do not specify whether such must be automatic and the Court rejects that it must be automatic. The second issue is whether the "condition for granting the second object" is necessarily a predetermined count threshold that must be met by a count of transfer records. It is not.

The claims of the '655 Patent provide significant guidance regarding the nature of the "grant" and when it granted. For example:

- Claim 1 recites: "the server comprising: . . . a processor configured to: . . . determine whether the transfer information of the second user ***satisfies a condition for granting*** a second object when the first object is transferred in response to the request for transfer, for granting; ***grant*** the second object used in the service to the second user ***if***

---

[11] Videotaped Deposition of Masaru Takeuchi, Volume 1 (Jan. 16, 2020).

the transfer information of the second user ***satisfies the condition*** for granting the second object" (emphasis added).

- Claim 7 recites: "A method for controlling a server . . . the method comprising: . . . determining whether the transfer information of the second user ***satisfies a condition for granting*** a second object when the first object is transferred in response to the request for transfer; ***granting***, by the server, the second object used in the service to the second user ***<u>when</u>*** the transfer information of the second user ***satisfies the condition*** for granting the second object" (emphasis added).

- Claim 8 recites: "A computer-readable, non-transitory medium storing a control program for a server . . . wherein the control program causes the server to execute a process, the process comprising: . . . determining whether the transfer information of the second user ***satisfies a condition for granting*** a second object when the first object is transferred in response to the request for transfer; ***granting*** the second object used in the services to the second user ***<u>when</u>*** the transfer information of the second user ***satisfies the condition*** for granting the second object" (emphasis added).

The Court rejects Defendant's proposal to limit the "grants" and "granting" of the claims to automatic grants/granting. As plainly expressed in the claims, the server grants the second object "if" the condition for granting the object is satisfied in Claim 1 and the server grants the second object "when" the condition for granting the object is satisfied in Claims 7 and 8. Defendant essentially proposes rewriting the "if" and "when" of the claims as "automatically if" but has not identified anything that rises to the exacting standard to so limit the claims.

The Court also rejects Defendant's proposal to limit the "condition for granting" the second object to the details of the described embodiments. Defendant's proposal supplants the clear and

broad claim language "condition for granting" with details from the described embodiments. Yet Defendant has not identified anything that rises to the exacting standard required to replace the plain claim language with specifics from the description of the described embodiments.

Accordingly, the Court rejects Defendant's proposed constructions and determines that these terms have their plain and ordinary meanings without the need for further construction.

### A-14. "notifying the device of the second user that the first object is transferred, or that the second object is granted"

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "notifying the device of the second user that the first object is transferred, or that the second object is granted"<br><br>• '655 Patent Claims 1, 7, 8 | plain and ordinary meaning | posting a message on the device of the second user including message text alerting the second user that the first object is transferred, or that the second object is granted |

**The Parties' Positions**

Plaintiff submits: There is no evidence to justify limiting "notifying the device of the second user" to "posting a message on the device of the second user including message text alerting the second user." '070 Case Dkt. No. 115 at 30–31.

Defendant responds: The claims do not explain how the notifying is accomplished. As explained in the '655 Patent, "notifying" is done by "posting on the second user's device a message including text to alert the second user." '070 Case Dkt. No. 126 at 24.

In addition to the claims themselves, Defendant cites the following **intrinsic evidence** to support its position: '655 Patent col.10 ll.16–47, col.13 l.53 – col.14 l.19, col.14 ll.47–49.

Plaintiff replies: Defendant's proposed limitation is not justified. '070 Case Dkt. No. 130 at 16–17.

**Analysis**

The issue in dispute distills to whether the "notifying the device of the second user" recited in the claims is necessarily accomplished through "posting a message on the device of the second user including message text alerting the second user" as described in the '655 Patent. It is not.

The Court rejects Defendant's proposed construction. Again, Defendant attempts to supplant the claims with details from the description of the embodiments. And again, Defendant has not identified anything the rises to the exacting standard required to import limitations from the description into claims that do not express them.

Accordingly, the Court rejects Defendant's proposed construction and determines that this term has its plain and ordinary meaning without the need for further construction.

### A-15. "shooting effective range"

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "shooting effective range"<br><br>• '873 Patent Claims 1, 8, 10, 11 | range at which a shooting action is effective | plain and ordinary meaning<br><br>alternatively,<br>• a range within which shooting action may be effective |

**The Parties' Positions**

Plaintiff submits: This term should be construed to clarify that "when a shooting action occurs while a target is in a 'shooting effective range,' then the shooting action will be effective, i.e., it can hit the desired target." This comports with the '873 Patent's description of the invention. The "shooting effective range" is displayed to a user and differs from what a firearm user might view through a traditional rifle scope in that firing at a target within the "shooting effective range" will necessarily result in hitting the target, while firing at a target within the rifle-scope sight may result

in missing the target. This difference should be clarified to avoid jury confusion. '070 Case Dkt. No. 115 at 32–33.

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support its position: '873 Patent fig.4, col.5 ll.21–23.

Defendant responds: The meaning of "shooting effective range" is readily apparent without construction. Plaintiff's proposed construction improperly narrows the scope of this limitation by requiring the shots fired at a target with the shooting effective range will necessarily be effective. The '873 Patent, however, explains that the displayed gun sights are simply simulating an image of an optical sight (scope). '070 Case Dkt. No. 126 at 27–28.

In addition to the claims themselves, Defendant cites the following **intrinsic evidence** to support its position: '873 Patent col.4 ll.42–43, col.5 ll.15–17.

Plaintiff replies: The "shooting effective range" of the claims is indicated by the "target circle TC" of the description, and the "target circle TC" of the description indicates a range in which shooting necessarily is effective. Defendant recognized this in a recent petition for Inter Partes Review of the '873 Patent. '070 Case Dkt. No. 130 at 17.

Plaintiff cites further intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '873 Patent fig.2, col.6 ll.29–36. **Extrinsic evidence**: Petition for Inter Partes Review of U.S. Patent No. 9,795,873 at 13–14, 19, *Supercell Oy v. GREE, Inc.*, IPR2020-00215 (P.T.A.B. Dec. 4, 2019), Paper No. 2 (Plaintiff's Ex. 1, '070 Case Dkt. No. 130-1 at 19–20, 25).

## Analysis

The issue in dispute is whether "shooting effective range" in the '873 Patent is a range within which shooting necessarily is effective. It is not.

48

The '873 Patent does not describe the shooting effective range as one in which a shot necessarily hits the target. Rather, the patent provides:

> FIG. 4 is a view illustrating an image of the part of the shooting button circle SC which is displayed on the display unit 17 at this time. As illustrated in FIG. 4, the shooting button circle SC simulates an image of the view field of an optical sight (scope) centering at cross hair CH having a cross shape, which is disposed at the touch position. The concentric target circle TC is displayed inside the shooting button circle SC, for example, by a red broken line (a black broken line in FIG. 4). The **target circle TC is representative of a range in which a bullet <u>can</u> hit an attack target by executing shooting by an auto-aiming function**.
>
> FIG. 4 illustrates a state in which the attack target MT deviates from the cross hair CH, but a major part of the upper body is within the target circle TC and it is **highly possible** that shooting is successfully executed by the auto-aiming function and a bullet hits the attack target MT.

'873 Patent col.5 ll.13–28 (emphasis added). Plaintiff presents the "target circle TC" as the shooting effective range. The above-quoted passage does not, however, equate the target circle TC with a range within which a bullet "will" hit a target. Rather, it states that TC represents a range within which a bullet "can" hit a target. Further, the passage explains that even when a "major part" of the target is within the target circle TC, it is only "highly possible" that the bullet will hit the target (and then only with the "auto-aiming function"). Simply, this contradicts Plaintiff's proposal.

Accordingly, the Court construes "shooting effective range" as follows:

- "shooting effective range" means "range in which an attack target can be hit."

### A-16. "touch operation"

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "touch operation"<br><br>• '873 Patent Claims 1, 9, 10, 11 | plain and ordinary meaning | operation that brings the user's finger or other object, such as a stylus, into contact with touch panel |

**The Parties' Positions**

Plaintiff submits: The meaning of "touch operation" is readily apparent without construction. It "refers to an action in which a user interacts with the screen through touch, such as by touching, pressing on, sliding, or even removing a finger from the screen." Defendant's proposed construction improperly limits the "touch operation" to an operation that first brings a finger or other object into contact with the touch panel. In fact, the '873 Patent discloses a touch operation after the user's finger is in contact with the touch panel (citing '873 Patent col.5 ll.47–51). '070 Case Dkt. No. 115 at 33–34.

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support its position: '873 Patent col.1 ll.24–32, col.4 ll.19–24, col.4 ll.29–32, col.5 ll.29–41, col.5 ll.47–51.

Defendant responds: The plain meaning of a "touch operation" is an operation that involves touching something, bringing an object into contact with something. Thus, a "touch operation" is distinct from a "sliding operation," in which contact is maintained. The "slide operation" is used in the claims and the description of the invention as an operation distinct from the "touch operation." The "touch operation" is also distinct from removing a finger from the touch screen, as removing a finger cannot be accepted or received as input by the touch panel, which are described as necessary features of a "touch operation." This comports with an inventor's deposition testimony that the "touch operation" is tapping. Finally, the term "touch" in touch operation is improperly not given any effect under Plaintiff's proposed interpretation. This is because the claims require interaction through a touch panel and all such interactions are through touch. Thus, under Plaintiff's proposed understanding, a "touch operation on the touch panel," as

recited in the claims, is no different than an "operation on the touch panel," improperly rendering superfluous "touch" in "touch operation." '070 Case Dkt. No. 126 at 28–32.

In addition to the claims themselves, Defendant cites the following intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '873 Patent, at [57] Abstract, fig.2, col.1 ll.16–22, col.2 ll.14–31, col.4 ll.19–37, col.4 ll.47–52, col.5 ll.29–31, col.5 ll.35–37, col.6 ll.4–6. **Extrinsic evidence**: *Webster's New College Dictionary* at 1192 (3d ed. 2008), "touch" (Defendant's Ex. Q, '070 Case Dkt. No. 126-18 at 4); *The American Heritage Dictionary* at 859 (5th ed. 2012), "touch" (Defendant's Ex. R, '070 Case Dkt. No. 126-19 at 4); Nagano Dep. vol.1[12] at 80:3–8 (Defendant's Ex. M, '070 Case Dkt. No. 126-14 at 9); Nagano Dep. vol.2[13] at 157:23 – 158:3 (Defendant's Ex. N, '070 Case Dkt. No. 126-15 at 5–6).

Plaintiff replies: In a petition for Inter Partes Review of the '873 Patent, Defendant represented that the plain meaning of "touch operation" is understandable without construction and Defendant should here be held to that. There is nothing in the intrinsic record that limits the "touch operation" to the "tap" operation Defendant advocates. The dictionary definitions Defendant relies upon simply establish that "touch" has a broad meaning. And the inventor testimony is of little significance with regard to claim construction. '070 Case Dkt. No. 130 at 18–19.

Plaintiff cites further **extrinsic evidence** to support its position: Zagal '873 Patent IPR Decl. ¶ 63, *Supercell Oy v. GREE, Inc.*, IPR2020-00215 (P.T.A.B. Dec. 4, 2019), Ex. 1007 (Plaintiff's Ex. 2, '070 Case Dkt. No. 130-2).

---

[12] Videotaped Deposition of Tadashi Nagano Volume 1 (Jan. 14, 2020).
[13] Videotaped Deposition of Tadashi Nagano Volume 2 (Jan. 15, 2020).

## Analysis

The issue in dispute appears to be whether a "touch operation" on a touch panel in the '873 Patent is necessarily limited to the initial contact of an object (like a finger or stylus) with the touch panel. It is not.

To begin, Defendant's reliance on inventor testimony is misplaced. The Federal Circuit has instructed:

> Whether an inventor's testimony is consistent with a broader or narrower claim scope, that testimony is still limited by the fact that an inventor understands the invention but may not understand the claims, which are typically drafted by the attorney prosecuting the patent application. As we have explained, "it is not unusual for there to be a significant difference between what an inventor thinks his patented invention is and what the ultimate scope of the claims is after allowance by the PTO." [*Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 985 (Fed. Cir. 1995)]. Moreover, [Defendant's] asserted approach, to rely on inventor testimony when it is contrary to interest, is unworkable. It would require a case by case determination as to whether an inventor is testifying against his or her interest. The inventor might testify to a broad claim scope in order to increase the likelihood of a finding of infringement. The inventor also might testify to a narrower claim scope to avoid a challenge to the validity of the patent. ***We hold that inventor testimony as to the inventor's subjective intent is irrelevant to the issue of claim construction***.

*Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.*, 540 F.3d 1337, 1346 (Fed. Cir. 2008) (emphasis added). The fact that Mr. Nagano testified that he (and the other inventors) intended that the "best" way for shots to be fired in the invention was by a "tap" on the screen is irrelevant to claim construction.

Further, the '873 Patent does not equate "touch" with "tap" as Defendant suggests. For example, the patent expressly discloses a "tap" operation. '873 Patent col.1 ll.30–31. The fact that the claims recite "touch" and not "tap" suggests that "touch" and "tap" are not strictly synonymous. Further, the patent describes a touch operation that involves maintaining contact rather than initiating contact: "In the case where the outer edge of the shooting button circle SC has been touch-operated, if this operation is determined in step S108, the CPU 11 accepts a subsequent slide

52

operation of ***moving the touch operation while the touch state on the touch panel unit 18 is being kept.*** *Id.* at col.5 ll.47–51. This again suggests that "touch" and "tap" are not strictly synonymous. Rather, "touch" as used in the patent broadly encompasses operations involving contact with the touch panel.

Accordingly, the Court construes "touch operation" as follows:

- "touch operation" means "operation that involves the user's finger or other object, such as a stylus, on the touch panel."

### A-17.   The Display-a-Frame Terms

| Disputed Term[14] | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "cause the display to display a first frame indicative of a shooting effective range in accordance with a position of the first touch operation"<br><br>• '873 Patent Claim 1 | plain and ordinary meaning | display the first frame indicative of a shooting effective range in response to and at the position of the first touch operation |
| "control the display to display a frame indicative of a shooting effective range in accordance with a position of the first touch operation"<br><br>• '873 Patent Claim 8 | | |
| "controlling the first computer to … display a first frame indicative of a shooting effective range on the display in accordance with a position of the first touch operation"<br><br>• '873 Patent Claim 9 | | |

---

[14] The parties identified the disputed terms as "[cause/control] the display to display a first frame indicative of a shooting effective range in accordance with a position of the first touch operation" and identified the implicated claims as "9,795,873 1, 8, 9, 10, 11." '070 Case Joint Claim Construction Chart, Dkt. No. 131 at 6. The term identified by the parties does not appear in Claims 8, 9, 10, and 11 of the '873 Patent. The Court here identifies comparable "displaying" limitations found in those claims.

| Disputed Term[14] | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "displaying, by the display of the terminal device, a frame indicative of a shooting effective range in accordance with a position of the first touch operation"<br><br>• '873 Patent Claim 10 | | |
| "control a display of the electronic device to display a first frame indicative of a shooting effective range in accordance with a position of the first touch operation"<br><br>• '873 Patent Claim 11 | | |

Because the parties' arguments and proposed constructions with respect to these terms are related, the Court addresses the terms together.

**The Parties' Positions**

Plaintiff submits: Displaying the "frame indicative of a shooing effective range" "in accordance with a position of the first touch operation" does not means the frame is necessarily displayed "at the position of the first touch operation." '070 Case Dkt. No. 115 at 35.

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support its position: '872 Patent col.2 ll.14–28.

Defendant responds: As consistently described in the '873 Patent, the frame indicating the shooting effective range is displayed at the location of the touch and in response to the touch on the touch panel. That the display was in response to the touch operation was explained during prosecution of the '302 Patent. '070 Case Dkt. No. 126 at 32–33.

In addition to the claims themselves, Defendant cites the following intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '873 Patent col.4 ll.19–37, col.5 ll.6–23; '302 Patent File Wrapper June 13, 2018 Amendment at 9 (Defendant's Ex. T, '070 Case Dkt. No.

126-21 at 4). **Extrinsic evidence**: Nagano Dep. vol.1 at 78:16 – 79:5 (Defendant's Ex. M, '070

Case Dkt. No. 126-14 at 7–8).

Plaintiff replies: While the '873 Patent describes displaying the frame at the location of the

touch position, this is a description of an embodiment and thus should not be used to limit broader

claim language. Further, Defendant represented in its petition for Inter Partes Review of the '873

Patent that this limitation means "that the touch operation 'causes the first frame to be displayed.'"

'070 Case Dkt. No. 130 at 19–20.

Plaintiff cites further intrinsic and extrinsic evidence to support its position: **Intrinsic**

**evidence**: '873 Patent col.2 ll.64–67. **Extrinsic evidence:** Petition for Inter Partes Review of U.S.

Patent No. 9,795,873 at 16, *Supercell Oy v. GREE, Inc.*, IPR2020-00215 (P.T.A.B. Dec. 4, 2019),

Paper No. 2 (Plaintiff's Ex. 1, '070 Case Dkt. No. 130-1 at 22).

#### Analysis

The issue in dispute is whether a frame displayed "in accordance with a position of the first

touch operation" in the '873 Patent necessarily means that the frame is necessarily displayed at the

position of the first touch operation. It does not.

A frame displayed "in accordance with" a position of a touch operation refers to the display

of the frame in response to the position of the touch operation, but this does not necessarily mean

the frame is displayed "at the position" of the touch operation. During prosecution of the '302

Patent (a continuation of the '873 Patent), the patentee distinguished prior art that "always displays

the mark (cross hairs)" from the then-pending claims that recited "display a frame indicative of a

shooting effective range in accordance with a first touch operation on the touch panel." The

patentee explained that the then-pending claims required "displaying the frame indicative of a

shooting range according to the first touch on the touch panel" and thus the pending claim "only

displays a frame upon a first touch detection." '302 Patent File Wrapper June 13, 2018 Amendment at 9, '070 Case Dkt. No. 126-21 at 4. Further, the "first touch displays the frame." *Id*. From this, the Court understands that "in accordance with" an operation is used in the '873 and '302 Patents to mean "in response to" the operation. *See NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1293 (Fed. Cir. 2005) (for "patents [that] derive from the same parent application and share many common terms, [courts] must interpret the claims consistently across all asserted patents").

The Court is not persuaded, however, that displaying a frame "in accordance with" a position of the first touch operation means that the frame is necessarily "at the position" of the first touch operation. For example, the '873 Patent describes a "target circle TC which [is] concentrically **center[ed] at** the touch-operated position" and a "cross hair CH having a cross shape, which is disposed ***at*** the touch position." '873 Patent col.5 ll.6–23 (emphasis added). This suggests that a frame may be displayed at a position based on the position of the touch operation (e.g., centered at) but not necessarily "at" the position of the touch operation. Simply, Defendant has not identified anything that rises to the exacting standard required to limit the position of the claimed display to be "at the position of the first touch operation."

Accordingly, the Court construes these terms by construing "in accordance with a position of the first touch operation" as follows:

- "in accordance with a position of the first touch operation" means "in response to and based on the position of the first touch operation."

### A-18.   "identify a second touch operation at the touch panel as an instruction for an attack when the first frame is displayed"

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "identify a second touch operation at the touch panel as an instruction for an attack when the first frame is displayed"<br><br>• '873 Patent Claims 1, 8, 9, 10, 11 | plain and ordinary meaning | when the frame is displayed, identify a touch operation that is separate from the first touch operation, as an instruction for an attack |

**The Parties' Positions**

Plaintiff submits: "[T]he first and second touch operations are different, but this is clear from the fact that they are denominated 'first' and 'second'" and does not need to be reflected in a construction. '070 Case Dkt. No. 115 at 36.

Defendant responds: The first and second touch operations must be entirely distinct, there cannot be any overlap. This is dictated by the meaning of "touch operation," which requires tapping. '070 Case Dkt. No. 126 at 33.

In addition to the claims themselves, Defendant cites the following **intrinsic evidence** to support its position: '873 Patent fig.2, col.4 ll.10–37.

Plaintiff replies: The "touch operation" is not necessarily a tap, and thus two touch operations can be different without requiring two taps. '070 Case Dkt. No. 130 at 20.

Plaintiff cites further **extrinsic evidence** to support its position: Zagal IPR Decl. ¶ 63, *Supercell Oy v. GREE, Inc.*, IPR2020-00215 (P.T.A.B. Dec. 4, 2019), Ex. 1007 (Plaintiff's Ex. 2, '070 Case Dkt. No. 130-2).

**Analysis**

The issue in dispute appears to be whether the claims of the '873 Patent exclude any overlap between the first and second touch operations. They do not, so long as the first and second touch operations are different operations.

For the reasons explained above, the Court rejects Defendant's proposed construction because it is based on an improper interpretation of "touch operation." Specifically, the term "touch operation" is not limited to tapping. Thus, while the second touch operation is necessarily distinguishable from the first touch operation (they are two different operations), this does not mean that there is necessarily no overlap between the two operations. For example, and as set forth above, the '873 Patent describes: "In the case where the outer edge of the shooting button circle SC has been touch-operated, if this operation is determined in step S108, the CPU 11 accepts a subsequent slide operation of moving the touch operation while the touch state on the touch panel unit 18 is being kept." '873 Patent at col.5 ll.47–51. This describes two touch operations that expressly overlap: the first is the touch operation on the outer edge of the shooting button circle, the second is the sliding operation that moves the outer-edge touch operation while maintaining contact with the touch panel.

Accordingly, the Court rejects Defendant's proposed construction and determines that this term has its plain and ordinary meaning without the need for further construction.

### B.  Case No. 2:19-cv-172

#### B-1.  "shooting effective range"

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "shooting effective range"<br><br>• '302 Patent Claims 1, 5, 8–11, 15 | range at which a shooting action is effective | plain and ordinary meaning<br><br>alternatively,<br>• a range within which shooting action may be effective |

**<u>The Parties' Positions</u>**

Plaintiff submits substantially the same arguments presented above in the section on "shooting effective range" in the '873 Patent. '172 Case Dkt. No. 71 at 9–10.

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support its position: '302 Patent col.5 ll.21–23.

Defendant responds with substantially the same arguments presented above in the section on "shooting effective range" in the '873 Patent. '172 Case Dkt. No. 79 at 9–11.

In addition to the claims themselves, Defendant cites the following **intrinsic evidence** to support its position: '302 Patent col.4 ll.41–42, col.5 ll.15–17.

Plaintiff replies: with substantially the same arguments presented above in the section on "shooting effective range" in the '873 Patent. '172 Case Dkt. No. 82 at 8–10.

Plaintiff cites further intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '302 Patent figs.2, 4, col.6 ll.29–36. **Extrinsic evidence**: Petition for Inter Partes Review of U.S. Patent No. 10,286,302 at 13–14, 19, *Supercell Oy v. GREE, Inc.*, IPR2020-00310 (P.T.A.B. Dec. 17, 2019), Paper No. 2 (Plaintiff's Ex. 1, '172 Case Dkt. No. 82-1 at 19–20, 25).

## Analysis

The issue in dispute is whether "shooting effective range" in the '302 Patent is a range within which shooting necessarily is effective. For the reasons provided in the section on "shooting effective range" in the '873 Patent, it is not.

Accordingly, the Court construes "shooting effective range" as follows:

- "shooting effective range" means "range in which an attack target can be hit."

### B-2.    "first touch operation" and "second touch operation"

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "first touch operation"<br><br>• '302 Patent Claims 1, 8–11 | plain and ordinary meaning | first operation that brings the user's finger or other object, such as a stylus, into contact with touch panel |
| "second touch operation"<br><br>• '302 Patent Claims 1, 3, 5–11, 13, 15–17 | plain and ordinary meaning | second operation that brings the user's finger or other object, such as a stylus, into contact with touch panel |

Because the parties' arguments and proposed constructions with respect to these terms are related, the Court addresses the terms together.

### The Parties' Positions

Plaintiff submits substantially the same arguments presented above in the section on "touch operation" in the '873 Patent. '172 Case Dkt. No. 71 at 10–12.

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support its position: '302 Patent col.1 ll.28–36, col.4 ll.19–24, col.4 ll.29–32, col.5 ll.29–41, col.5 ll.47–51.

Defendant responds with substantially the same arguments presented above in the section on "touch operation" in the '873 Patent. '172 Case Dkt. No. 79 at 11–15.

In addition to the claims themselves, Defendant cites the following intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '302 Patent, at [57] Abstract, col.1 ll.16–22, col.2 ll.14–31, col.4 ll.15–37, col.4 ll.47–52, col.5 ll.29–31, col.5 ll.35–37, col.6 ll.4–6. **Extrinsic evidence**: *Webster's New College Dictionary* 1192 (3d ed. 2008), "touch" (Defendant's Ex. F, '172 Case Dkt. No. 79-7 at 4); *The American Heritage Dictionary* 859 (5th ed. 2012), "touch" (Defendant's Ex. G, '172 Case Dkt. No. 79-8 at 4); Nagano Dep. vol.1[15] at 80:3–8 (Defendant's Ex. B, '172 Case Dkt. No. 79-3 at 9); Nagano Dep. vol.2[16] at 157:23 – 158:3 (Defendant's Ex. C, '070 Case Dkt. No. 79-4 at 5–6).

Plaintiff replies with substantially the same arguments presented above in the section on "touch operation" in the '873 Patent. '172 Case Dkt. No. 82 at 10–13.

Plaintiff cites further **extrinsic evidence** to support its position: Zagal '302 Patent IPR Decl. ¶ 63, *Supercell Oy v. GREE, Inc.*, IPR2020-00310 (P.T.A.B. Dec. 17, 2019), Ex. 1007 (Plaintiff's Ex. 2, '172 Case Dkt. No. 82-2).

<u>**Analysis**</u>

The issue in dispute appears to be whether a "touch operation" on a touch panel in the '302 Patent is necessarily limited to the initial contact of an object (like a finger or stylus) with the touch panel. For the reasons provided in the section on "touch operation" in the '873 Patent, it is not.

Accordingly, the Court construes "touch operation" as follows:

- "first touch operation" means "first operation that involves the user's finger or other object, such as a stylus, on the touch panel";

- "second touch operation" means "second operation that involves the user's finger or other object, such as a stylus, on the touch panel."

---

[15] Videotaped Deposition of Tadashi Nagano Volume 1 (Jan. 14, 2020).
[16] Videotaped Deposition of Tadashi Nagano Volume 2 (Jan. 15, 2020).

### B-3.   The Display-a-Frame Terms

| Disputed Term[17] | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "cause the display to display a frame indicative of a shooting effective range in accordance with a first touch operation on the touch panel"<br><br>• '302 Patent Claim 1 | plain and ordinary meaning | display the frame indicative of a shooting effective range in response to and at the position of the first touch operation |
| "control the display to display a frame indicative of a shooting effective range in accordance with a first touch operation on the touch panel"<br><br>• '302 Patent Claims 8 | | |
| "controlling the first computer to display a frame indicative of a shooting effective range on the display in accordance with a first touch operation on the touch panel"<br><br>• '302 Patent Claim 9 | | |
| "displaying, by the display of the terminal device, a frame indicative of a shooting effective range in accordance with a first touch operation on the touch panel"<br><br>• '302 Patent Claim 10 | | |
| "control a display of the electronic device to display a first frame indicative of a shooting effective range in accordance with a first touch operation on the touch panel"<br><br>• '302 Patent Claim 11 | | |

---

[17] The parties identified the disputed terms as "[cause/control] the display to display a frame indicative of a shooting effective range in accordance with a first touch operation on the touch panel" and identified the implicated claims as "10,286,302 1, 8-11." '172 Case Joint Claim Construction Chart, Dkt. No. 84 at 2. The term identified by the parties does not appear in Claims 9, 10, and 11 of the '302 Patent. The Court identifies comparable "displaying" limitations found in those claims.

Because the parties' arguments and proposed constructions with respect to these terms are related, the Court addresses the terms together.

**The Parties' Positions**

Plaintiff submits substantially the same arguments presented above in the section on the Display-a-Frame Terms in the '873 Patent. '172 Case Dkt. No. 71 at 12–13.

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support its position: '302 Patent col.2 ll.17–31.

Defendant responds with substantially the same arguments presented above in the section on the Display-a-Frame Terms in the '873 Patent. '172 Case Dkt. No. 79 at 15–16.

In addition to the claims themselves, Defendant cites the following intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '302 Patent col.4 ll.19–37, col.5 ll.6–23; '302 Patent File Wrapper June 13, 2018 Amendment at 9 (Defendant's Ex. I, '172 Case Dkt. No. 79-10 at 4). **Extrinsic evidence**: Nagano Dep. vol.1 at 78:16 – 79:5 (Defendant's Ex. B, '172 Case Dkt. No. 79-3 at 7–8); Nagano Dep. vol.1 Ex. 2B (Defendant's Ex. E, '172 Case Dkt. No. 79-6).

Plaintiff replies with substantially the same arguments presented above in the section on the Display-a-Frame Terms in the '873 Patent. '172 Case Dkt. No. 82 at 13–15.

Plaintiff cites further intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '302 Patent col.2 ll.64–67, col.4 ll.17–37. **Extrinsic evidence**: Petition for Inter Partes Review of U.S. Patent No. 10,286,302 at 16, *Supercell Oy v. GREE, Inc.*, IPR2020-00310 (P.T.A.B. Dec. 17, 2019), Paper No. 2 (Plaintiff's Ex. 1, '172 Case Dkt. No. 82-1 at 22).

**Analysis**

The issue in dispute is whether the frame displayed "in accordance with a first touch operation" in the '302 Patent necessarily requires that the frame is displayed at the position of the

first touch operation. For the reasons provided in the section on The Display-a-Frame Terms in the '873 Patent, it is not.

Accordingly, the Court construes these terms by construing "in accordance with a first touch operation" as follows:

- "in accordance with a first touch operation" means "in response to and based on the first touch operation."

### B-4. "identify a second touch operation at the touch panel as an instruction for an attack when the frame is displayed" and "second touch operation in the frame"

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "identify a second touch operation at the touch panel as an instruction for an attack when the frame is displayed" <br><br> • '302 Patent Claims 1, 8–11 | plain and ordinary meaning | when the frame is displayed, identify a touch operation that is separate from the first touch operation, as an instruction for an attack |
| "second touch operation in the frame" <br><br> • '302 Patent Claims 3, 13 | plain and ordinary meaning | a touch operation that is separate from the first touch operation, in which the user's finger is brought into contact with the touch panel at a location inside a boundary of the displayed frame |

Because the parties' arguments and proposed constructions with respect to these terms are related, the Court addresses the terms together.

### The Parties' Positions

Plaintiff submits substantially the same arguments presented above in the section on "identify a second touch operation . . ." in the '873 Patent. '172 Case Dkt. No. 71 at 13–14.

Defendant responds with substantially the same arguments presented above in the section on "identify a second touch operation . . ." in the '873 Patent. '172 Case Dkt. No. 79 at 16–18.

In addition to the claims themselves, Defendant cites the following intrinsic evidence to support its position: '302 Patent fig.2, col.4 ll.10–37, col.4 ll.47–57, col.6 l.65 – col.7 l.2.

Plaintiff replies with substantially the same arguments presented above in the section on "identify a second touch operation . . ." in the '873 Patent. '172 Case Dkt. No. 82 at 15–16.

Plaintiff cites further **intrinsic evidence** to support its position: '302 Patent col.2 ll.64–67.

**Analysis**

The issue in dispute appears to be whether the claims of the '302 Patent exclude any overlap between the first and second touch operations. For the reasons provided in the section on "identify a second touch operation at the touch panel as an instruction for an attack when the first frame is displayed" in the '873 Patent, they do not, so long as the first and second touch operations are different operations.

Accordingly, the Court rejects Defendant's proposed construction and determines that these terms have their plain and ordinary meanings without the need for further construction.

**B-5.   "first frame"**

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "first frame"<br><br>• '302 Patent Claim 2 | the frame | indefinite |

**The Parties' Positions**

Plaintiff submits: Claim 2 of the '302 Patent includes an obvious typographical error: it recites a single frame, and "first frame" should state "the frame" as it does in the substantially similar Claim 12. Even if this is not a typographical error that may be corrected by the Court, Defendant has not proffered anything more than attorney argument that the claim is indefinite for lack of

antecedent basis. Specifically, Defendant has not provided any expert testimony regarding the meaning of this term. '172 Case Dkt. No. 71 at 14–16.

Defendant responds: This is not the type of error that the Court may correct since the appropriate correction is subject to reasonable debate. Specifically, the '302 Patent describes two frames that may be indicative of the shooting effective range, the shooting circle SC and the target circle TC. Thus, the claim may be directed to two frames rather than a single frame and the error may be other than the one Plaintiff suggests. "First frame" thus lacks antecedent reference and its meaning therefore is uncertain. Further, expert testimony is not necessary to determine if a claim is indefinite for lack of antecedent basis. '172 Case Dkt. No. 79 at 19–20.

Plaintiff replies: Given the context of the claims, including Claim 12, the only frame in Claim 2 is the "frame indicative of a shooting effective range" and thus "first frame" refers to this frame. In fact, this is how Defendant and its expert presented the claim to the PTAB in a petition for Inter Partes Review of the '302 Patent. Finally, Defendant necessarily cannot meet its burden to prove Claim 2 is indefinite since it did not submit expert opinion on the issue. '172 Case Dkt. No. 82 at 17–18.

Plaintiff cites further **extrinsic evidence** to support its position: Petition for Inter Partes Review of U.S. Patent No. 10,286,302 at 47–48, *Supercell Oy v. GREE, Inc.*, IPR2020-00310 (P.T.A.B. Dec. 17, 2019), Paper No. 2 (Plaintiff's Ex. 1, '172 Case Dkt. No. 82-1 at 26–27); Zagal '302 Patent IPR Decl. ¶ 165, *Supercell Oy v. GREE, Inc.*, IPR2020-00310 (P.T.A.B. Dec. 17, 2019), Ex. 1007 (Plaintiff's Ex. 2, '172 Case Dkt. No. 82-2).

<u>**Analysis**</u>

The issue in dispute is whether the meaning of "first frame" in Claim 2 of the '302 Patent is reasonably certain when read in the proper context. It is.

To begin, contrary to Plaintiff's contention, it is not necessary to have expert testimony on the issue of indefiniteness. *See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1342 (Fed. Cir. 2015) ("A party cannot transform into a factual matter the internal coherence and context assessment of the patent simply by having an expert offer an opinion on it. The internal coherence and context assessment of the patent, and whether it conveys claim meaning with reasonable certainty, are questions of law.")

Claim 2 of the '302 Patent, along with Claim 1, from which Claim 2 depends, provides:

> 1. A non-transitory computer-readable medium including computer-program instructions, which when executed by an electronic device including a display configured to display a game image and a touch panel provided integral with the display, cause the electronic device to:
>    cause the display to display *a frame* indicative of a shooting effective range in accordance with a first touch operation on the touch panel;
>    identify a second touch operation at the touch panel as an instruction for an attack when *the frame* is displayed; and
>    control to attack in accordance with a display position of *the frame* when the instruction for the attack is identified.
>
> 2. The non-transitory computer-readable medium of claim 1, wherein the computer-program instructions are configured to cause the electronic device to:
>    identify a ***slide operation*** on *the frame* on the touch panel; and
>    cause the display to move ***first frame*** in the game image ***in accordance with the slide operation***.

Thus, Claim 2 identifies a slide operation on the frame that Claim 1 causes to be displayed. Claim 2 further causes the display to move a frame in "accordance with *the* slide operation." While the frame moved in accordance with the slide operation is labeled "first frame" instead of "the frame," there is only one frame in the dependency chain and there is only one frame for which a slide operation is identified. In this context, the only reasonable construction of Claim 2 is that "first frame" which is moved in accordance with the slide operation refers to "the frame" for which the slide operation is identified. Notably, this is the interpretation Defendant presents to the Patent Trial and Appeal Board: "Kolmykov-Zotov discloses identifying 'a slide operation on the frame

on the touch panel', and ***moving the frame*** in the game image in accordance with the slide

operation of claims 2 and 12." Petition for Inter Partes Review of U.S. Patent No. 10,286,302 at

47, *Supercell Oy v. GREE, Inc.*, IPR2020-00310 (P.T.A.B. Dec. 17, 2019), Paper No. 2 (emphasis

added), '172 Case Dkt. No. 82-1 at 26.

Accordingly, Defendant has failed to establish that Claim 2 is indefinite for including "first

frame" and the Court construes "first frame" as follows:

- "first frame" means "the frame."

### B-6. "a slide operation"

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "a slide operation"<br><br>• '302 Patent Claims 2, 12 | plain and ordinary meaning | operation following a touch operation in which the user moves the location of the user's finger from the touch operation position while maintaining contact with the touch panel |

### The Parties' Positions

Plaintiff submits: The meaning of the "slide operation" is readily apparent without

construction. Rather than being distinct from "touch operation," the "slide operation" is a type of

touch operation. '172 Case Dkt. No. 71 at 17.

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support

its position: '302 Patent col.5 ll.47–51.

Defendant responds: As described in the '302 Patent, a "slide operation" involves "moving

the touch operation while the touch state on the touch panel unit is being kept" (quoting '302 Patent

col.5 ll.50–51). This comports with the customary meaning of "slide" which requires smooth

continuous contact with a surface. And as explained in the patent, the "slide operation" moves a

"touch operation" and is therefore distinct from a "touch operation." '172 Case Dkt. No. 79 at 20–21.

In addition to the claims themselves, Defendant cites the following intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '302 Patent col.5 ll.47–51. **Extrinsic evidence**: *The American Heritage Dictionary* 1303 (4th ed. 2007), "slide" (Defendant's Ex. J, '172 Case Dkt. No. 79-11 at 4).

Plaintiff replies: As Defendant and its expert represented to the PTAB, one of ordinary skill in the art would have no difficulty in applying the plain and ordinary meaning of "slide operation" without construction of the term. '172 Case Dkt. No. 82 at 18–19.

Plaintiff cites further **extrinsic evidence** to support its position: Zagal '302 Patent IPR Decl. ¶ 63, *Supercell Oy v. GREE, Inc.*, IPR2020-00310 (P.T.A.B. Dec. 17, 2019), Ex. 1007 (Plaintiff's Ex. 2, '172 Case Dkt. No. 82-2).

## <u>Analysis</u>

The issues in dispute distill to whether a "slide operation" is necessarily distinct from a "touch operation." It is not. Rather, the Court understands that "slide operation" is a type of "touch operation."

The issue here is similar to those addressed in the sections on "touch operation" and "identify a second touch operation . . ." of the '873 Patent. For the reasons set forth in those sections, the Court understands that "slide operation" is a specific type of "touch operation" rather than being wholly distinct from a "touch operation." Specifically, the '302 Patent, like the '873 Patent, provides:

> In the case where the outer edge of the shooting button circle SC has been touch-operated, if this operation is determined in step S108, the CPU 11 accepts a subsequent slide operation of moving the touch operation while the touch state on the touch panel unit 18 is being kept. Based on the accepted content, the CPU 11

moves the display position of the shooting button circle SC and target circle TC (step S110).

'302 Patent col.5 ll.47–54. This passage does not distinguish "slide operation" from "touch operation" in the abstract. Rather, it notes that a slide operation may move "*the* touch operation," referring to the specific antecedent outer-edge touch operation.

Accordingly, the Court construes "a slide operation" as follows

- "a slide operation" means "an operation that involves moving the user's finger or other object, such as a stylus, on the touch panel."

## V.    CONCLUSION

The Court adopts the constructions above for the disputed and agreed terms of the Asserted Patents. Furthermore, the parties should ensure that all testimony that relates to the terms addressed in this Order is constrained by the Court's reasoning. However, in the presence of the jury the parties should not expressly or implicitly refer to each other's claim construction positions and should not expressly refer to any portion of this Order that is not an actual construction adopted by the Court. The references to the claim construction process should be limited to informing the jury of the constructions adopted by the Court.

**SIGNED this 8th day of May, 2020.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE